```
1              UNITED STATES OF AMERICA

2             EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4    KEVIN SCOTT,

5            Plaintiff

6        V                      Case No.  16-13734

7    TROTT LAW, P.C.,

8            Defendants.

9    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

10                 MOTION HEARING

11        BEFORE CHIEF JUDGE DENISE PAGE HOOD

12               U.S. DISTRICT COURT

13        231 W. LAFAYETTE STREET, COURTROOM 730

14                DETROIT, MICHIGAN

15             WEDNESDAY, APRIL 19, 2017

16   APPEARANCES:

17   FOR THE PLAINTIFF:        KEVIN SCOTT, PRO SE

18                             29343 FIELDSTONE

19                             FARMINGTON HILLS, MI 48334

20   FOR THE DEFENDANT:        RICHARD WELKE,

21                             TROTT LAW, P.C.

22                             31440 NORTHWESTERN HWY.

23                                STE. 200

24                             FARMINGTON HILLS, MI 48334

25
```

1                          I N D E X                          PAGE

2    MOTION HEARING                                            3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Wednesday, April 19, 2017

2                    Detroit, Michigan

3                    At approximately 3:34 p.m.

4                    THE CLERK:  Calling case number 16-13734,

5    Scott versus Trott.  Put your appearances on for the

6    record, please.

7                    MR. SCOTT:  Kevin Scott.

8                    THE COURT:  Good afternoon, Mr. Scott.  How

9    are you?

10                   MR. SCOTT:  I'm fine, Ma'am.  How are you?

11                   THE COURT:  Good.

12                   MR. WELKE:  Richard Welke, Counsel for Trott

13   Law.

14                   THE COURT:  Thank you.

15                   This is the Defendant's Motion for Summary

16   Judgment and I'm ready to proceed.

17                   MR. WELKE:  Your Honor, there are four

18   motions scheduled today.  I have two --

19                   THE COURT:  Yes, I know there is also a

20   Motion to Quash Subpoena, Second Motion to Compel

21   Discovery and Enforce Order for Sanctions and a Motion

22   to Extend Discovery, but I think the main motion to be

23   heard is the Motion for Summary Judgment.

24                   I don't really know that you need argument

25   on the other ones unless you insist, and so I'm prepared

1   to hear the motion for summary judgment.

2              THE COURT:  Mr. Scott, you can be seated.

3   Have you had a motion heard before?

4              MR. WELKE:  I'm sorry?

5              THE COURT:  I'm addressing Mr. Scott to find

6   out whether he has had a motion here before.  Have you?

7              MR. SCOTT:  Yes, Ma'am.

8              THE COURT:  So you know that whoever

9   proposes the motion goes first, you will get to respond

10  and then he'll get to reply, okay.

11             MR. SCOTT:  Yes, Ma'am.

12             THE COURT:  Very good.  Let's go forward.

13             MR. WELKE:  As the Court is aware from the

14  pleadings, this is basically Mr. Scott's alleging

15  violations of the Fair Debt Collection Practices Act and

16  he is also alleging that we -- that Trott Law committed

17  fraud and misrepresented the amount of his debt, the

18  verification and other issues.

19             Based on the -- largely based on that

20  particular conduct, Mr. Scott has alleged also state

21  collection violations and intentional inflection of

22  emotional distress.  And he also has a 1981 claim.

23             Essentially, this matter involves a mortgage

24  foreclosure by advertisement.

25             On September 20th, Trott Law sent Mr. Scott

1   what is called a Fair Debt Letter which lists the total

2   amount due and also lists certain rights that are

3   required under the Fair Debt Collection Practices Act.

4   One of those is the validation request.

5             They have 30 days to request or to dispute

6   the amount of the debt, and if they notify the

7   collector, then the collector has several options.

8             Mr. Scott did notify, did send a letter, a

9   dispute letter to Trott that was received on or about

10  October 11th.

11            Once that dispute letter was received, under

12  the Fair Debt statute, 1692(g), the collector has two

13  options.  He either ceases to any collection activity

14  until the debt is verified or he ceases collection

15  activity altogether.

16            Once we received the dispute letter, we

17  ceased collection and forwarded that dispute letter to

18  our client, which was Bank of America at the time, for

19  verification.

20            Mr. Scott claims that we did not cease

21  collection activity.

22            He claims that the posting of his property

23  and some of the publications occurred after the October

24  11th date.  And the October 11th date is the important

25  date that we're concerned with here.

1          The posting and the publication were ordered

2     by Trott Law on or about October 5th and they were

3     ordered to be done by third-party contractors.

4          And they were done.

5          We have cited to a case of Smith versus

6     Transworld, 953 F.2d 1025 in our brief that there is no

7     obligation to verify if collection activity ceases.

8          Now, we have also cited in our brief to

9     approximately six cases that 1692 (g) imposes no

10    obligation to interfere or to cancel with any activities

11    that have been ordered prior to the dispute letter but

12    carried out by third parties.

13         Mr. Scott has not disputed those cases.  Mr.

14    Scott has not distinguished those cases.  Mr. Scott has

15    not offered any authority for the proposition that

16    collection activities that were ordered prior to the

17    dispute letter and carried out by third parties are

18    violations that can impose liability upon the collector.

19         Essentially, the basis of our summary

20    judgment motion is that this matter can be decided as a

21    matter of law.

22         We ceased collection, we did not initiate

23    any collection activity after the receipt of the dispute

24    letter, and therefore, no liability can incur.

25         Now, we also -- Mr. Scott also claims that

1    we had a duty or we were supposed to or we should have

2    contacted other attorneys with whom it appears that he

3    has been sending his checks or his checks for the loan

4    payment for the last two or three years.

5              Those law firms are Madden, Hauser and Brian

6    Cave.  He indicates that we should have verified or we

7    should have checked with them and verified that they had

8    received the payments.

9              Section 1692 (g) imposes no liability or no

10   duty to investigate any of the amount due or anything

11   regarding what the -- what is provided.

12             Furthermore, even if we had called those

13   particular attorneys, it turns out from discovery that

14   those attorneys either sent those checks back to Mr.

15   Scott or they forwarded those checks to the Bank of

16   America who then in turn sent them back to Mr. Scott for

17   one reason or another.

18             The bottom line is that Trott, as a

19   collector, ceased collection activity and did not

20   initiate any act after receipt of that dispute letter

21   and Mr. Scott cannot point to anything that we did after

22   October 11th when we received the dispute letter.

23             With regard to the fraud and

24   misrepresentation of the loan amount, Trott as the

25   collector received the referral from Bank of America.

1   Originally Mr. Scott indicated that Trott initiated this

2   foreclosure on its own, and there was no referral, no

3   Bank of America involved, no lender involved whatsoever

4   and that he claims was fraudulent.

5           It turns out from discovery that Bank of

6   America did refer this matter to Trott Law and we did

7   provide Trott Law with loan figures which we provided on

8   -- which were indicated on the referral, which were

9   indicated on the fair debt letter and which were

10  indicated on the publication.

11          Mr. Scott indicates also that we

12  misrepresented those numbers that we obtained from the

13  lender because they changed.  Basically they increased

14  over the 28 days from the referral to the publication.

15  And they increased in the amount of $729.34.  They went

16  from 179,889 to $180,618.  That was the total amount

17  that the lender claimed to be due.

18          What Mr. Scott is missing is the passage of

19  time and five hundred dollars and change of that 700 is

20  per diem interest.  The rest of it is loan charges, late

21  fees, et cetera.

22          But Mr. Scott is not challenging the 729, he

23  is not challenging the $228 that's left after the per

24  diem interest, what Mr. Scott is challenging, he's

25  claiming that he's current.  He's claiming that his

1   balance due should be only approximately $60,000 when

2   the total debt is 180,000.  That's a $120,000

3   difference.  That's what Mr. Scott is disputing.

4           What this case is basically about is not

5   really the fair debt issue, what this case is really

6   about is a payment history dispute that Mr. Scott has

7   with his lender.

8           It appears from discovery and from

9   declarations, I think Brian Cave, attorney, did an

10  affidavit of format.  As late as February or March of

11  this year, it appears that Mr. Scott is still sending

12  payments to Brian Cave, Brian Cave is returning those

13  payments and Mr. Scott does not understand why he's in

14  default.

15          It is really a payment dispute with his

16  lender.  It's a dispute that cannot exist between Trott

17  and Mr. Scott, it has to be with his lender.

18          Basically, the fair debt, the fraud is based

19  on a fair debt and a fair debt is really not -- there is

20  really no liability there because as a matter of law we

21  ceased and the foreclosure sale never occurred and the

22  foreclosure was cancelled.

23          With regard to the balance of accounts, the

24  state claim, the state collection statute that Mr. Scott

25  refers to is also -- it's 339 or MCLA 339.918.  That

1   specifically has to do with validation of debts and that

2   mirrors the Fair Debt Collection Practices Act

3   validation provision.  That fails for the same reason

4   that the fair debt claim fails.

5          The RESPA claim, the only statute that Mr.

6   Scott cites to in his Complaint and in his pleadings is

7   12 U.S.C. 2605.  That is a RESPA statute and that is

8   related to mortgage servicing and qualified written

9   requests.

10          That fails to state a claim right out of the

11   box because Trott is not a mortgage servicer, Trott is a

12   law firm.

13          With regard to the intentional infliction of

14   emotional distress, in my motion I've cited to cases

15   that stand for the proposition that a mortgage

16   foreclosure by advertisement, even if the sale occurred

17   and was finalized, the redemption expired, is not a

18   sufficient basis in Michigan law for intentional

19   inflection of emotional distress.

20          With regard to his 1981 claim, Mr. Scott has

21   not satisfied several of the elements of a 1981 claim.

22          First of all, it's -- let me get to it --

23   there is no factual support for his statement or for his

24   claim that he was treated differently simply because of

25   his race.

1           He was referred to Trott Law for foreclosure

2    because he was in default not because of any other

3    reason.

4           One of the elements of a 1981 claim is that

5    the member of the protected class sought to make or

6    enforce a contract for goods or services that the

7    defendant usually provides.

8           The Defendant in this case is Trott Law.  We

9    did not provide Mr. Scott with any services.  We had no

10   intention of providing Mr. Scott with any services.  We

11   have no duty to Mr. Scott.  Our duty is to our client,

12   who is the lender, who initiates the foreclosure, and

13   that element is just simply absent.  As well as there is

14   no specific facts as far as any treatment that was

15   different simply because of his race.

16          With regard to -- I realize that it's taking

17   up a little bit of time and there are other motions that

18   may want to be heard, give Mr. Scott a chance, and I

19   thank you very much.

20          THE COURT:  Thank you very much.

21          You may respond to the motion for summary

22   judgment, Mr. Scott.

23          MR. SCOTT:  Good afternoon.

24          Your Honor, when I received Trott Law's fair

25   debt collection letter, it stated that Trott Law was a

1   debt collector.  With that September letter that I

2   received, Trott Law listed a debt in that letter in the

3   amount of $180,000 -- just a moment, Your Honor.  I want

4   to get the correct amount for it.

5           It was about $180,100 something dollars that

6   they listed in their fair debt letter.

7           When Trott listed my home after that point

8   because, as they said, I had 30 days to respond to the

9   debt that Bank of America said that I owed.  The first

10  violation with them was 18 days into the 30 days that I

11  had, Trott listed my home in the newspaper.

12          Now, the letter said, like I said, 180,100

13  and something dollars.  They then, 18 days later, they

14  listed my house into the newspaper and it went from

15  180,100 some dollars all the way up to 180,600 and

16  something dollars.

17          With that, all of it was false.  We never

18  heard from Bank of America because the last time we were

19  in your courtroom in front of you, Your Honor, you

20  advised Trott Law, you found out that they were going to

21  sell my house the next day on November 8th, 2016, at a

22  foreclosure.

23          As I tried to attempt to call Trott Law to

24  tell them that no payments were missing, Trott Law

25  refused to call me or to talk with me.

 1              Once it came up to the last date for me to
 2    do something, I had no choice but to file the Chapter 13
 3    to stop them because they were all set to sell my home.
 4              Trott Law also put in a response because I
 5    put in an injunction to try to stop them from selling my
 6    home and Trott Law responded with their brief to oppose
 7    it.  And the entire brief that they submitted they
 8    absolutely opposed the Court to stop the foreclosure
 9    sale of my home.
10              Again with no choice, I had to file Chapter
11    13.
12              When we came in front of you, Your Honor,
13    and you found out about it, and I told you I just filed
14    that to stop them because they just would not call me o
15    stop.  You asked Trott Law to verify the debt.  Two
16    weeks later, Trott Law still had not verified the debt,
17    and at that point, Your Honor, I did not know if Bank of
18    America was truly the complainant.
19              I had sent out several subpoenas to two law
20    firms --
21              THE COURT:  Was the complainant on what?
22              MR. SCOTT:  I beg your pardon, Your Honor?
23              THE COURT:  You didn't know whether or not
24    Bank of America was the complainant on what?
25              MR. SCOTT:  On Trott Law's ability to

1    foreclose on me.  I truly didn't know if they had the

2    authority to foreclose.  Did Bank of America hire them,

3    or, as I found out later, sent them a referral to

4    foreclose on me.

5            While we were --  you asked them to verify

6    it, two weeks later he never verified it, and then we

7    were called back in to do scheduling.

8            Once we came back in to do scheduling, Mr.

9    Welke advised me and two court employees that he did not

10   have a complainant.

11           With that also I had sent out several

12   subpoenas to the two law firms that were handling a case

13   that was closed with Bank of America with me or against

14   me.

15           With those subpoenas, I asked them if they

16   had any involvement, did they know anything, did they

17   talk to anyone.  I even sent them a letter with the

18   subpoena asking them to contact Trott Law to verify I

19   had given them all of my checks.

20           Their replies came back, Your Honor, saying

21   that they had nothing to do with the foreclosure.  They

22   had nothing to do with it.  They knew nothing about it.

23           THE COURT:  Who had nothing to do with it?

24           MR. SCOTT:  Madden, Hauser and then there

25   was Brian Cave, the attorneys from Brian Cave.  They

1   also both said they had nothing to do with the

2   foreclosure.

3           So with that, Your Honor, with the attorney

4   telling me he had no complainant, with my subpoenas

5   coming back saying that they had nothing to do with it,

6   the only thing I had left was that Trott Law just

7   basically pulled my name out the air to foreclose on me

8   because the evidence proved that they had no authority

9   to foreclose on me.

10          While we were going through discovery, Trott

11  refused to turn over the referral while we were in

12  discovery.  It took the Court three times to order him

13  to turn over the referral; and finally, they turned over

14  the referral.

15          And once we got the referral, then it opened

16  up and allowed us to see a lot more of what's going on.

17          First, when Bank of America did send Trott

18  Law the referral, the payoff amount was on the referral.

19  But if the Court can remember, while we were in front of

20  you the very first time, he insinuated to the Court as

21  if the referral did not have the payment on it because

22  he said he had to go back and verify it.  But it was

23  already on there.  So he did not have to go back and

24  verify anything because it listed the amount.

25          And as I said earlier, Your Honor, when you

1    look at the listed amount, Bank of America only listed

2    $179,000 and some change.

3           Trott Law admitted in discovery when I asked

4    them one of my questions did anyone contact you or give

5    you any information and Trott Law advised other than the

6    purser system, no one has given me anything.

7           So that meant that Trott Law went into the

8    purser, pulled up items from a closed case, and in fact,

9    everything that is in his brief citing about missing

10   payments, how much payments were missing, all came from

11   the purser system.  Nothing, in fact, has come from Bank

12   of America.  Even to this date.

13          Bank of America was never called in

14   discovery, Bank of America never gave any information or

15   any documents at all.  Everything came from Trott Law

16   going to the closed case into the referral system and

17   pulling numbers out.

18          So when Trott Law cites the numbers --

19          THE COURT:  Is this a closed case in this

20   Court?

21          MR. SCOTT:  It was a closed case in this

22   Court, yes, Ma'am.  It was against Kevin Scott, Bank of

23   America, and it went all the way up to the Court of

24   Appeals in which my case was denied.

25          So with that, Your Honor, everything he is

1    citing as far as he didn't do anything, he is a debt

2    collector, as a debt collector, there are certain things

3    that a debt collector must do, and one of those is you

4    have to verify the debt.

5              So when Bank of America sent him that

6    referral, Trott Law should have verified that debt with

7    Bank of America or you can wait.  So he waited.

8              Once I sent him a certified letter telling

9    him that I owed no money, they still listed my house

10   three more times in the newspaper.

11             Trott Law controlled those listings.  Yes,

12   they may have went to them the first time and gave them

13   all four, but Trott Law could have called back the other

14   listings.

15             It is not a third-party listing, Trott Law

16   paid for it and Trott Law could have pulled the other

17   three listings back.

18             Because with that, people were driving up to

19   my home, and as I wrote in one of my briefs was I'm

20   supposed to believe it was a joke that he was not going

21   to sell my house on November 8th?  It was all real.

22             And as the Court knows, if you look at his

23   injunction, he opposed everything about stopping the

24   foreclose.  He was going to sell my house on the 8th

25   without even talking to me.

1          Again, Your Honor, they never verified the

2    debt.

3          After the first time, once I gave them the

4    letter, they were supposed to call back to Bank of

5    America and verify the debt.

6          We find out later, because I gave Trott

7    letters asking them to contact the attorneys, I asked

8    them to contact the bank.  I said they all know that my

9    payments are valid because in the closed case that I had

10   with them, they told the Court that they counted all of

11   my money.  And with that, my case should be dismissed

12   because they counted all my money.

13         I objected to it and tried to point out the

14   different things showing that they did not count my

15   money and that they really, as I called it, extorted

16   another $20,000 from me.

17         That is the basis of my first lawsuit with

18   Bank of America was the fact that they said that I never

19   paid any money for taxes, my 2010 taxes.  And they said

20   I was six mortgage payments in arrears.

21         Judge Lawson did an independent study of my

22   payments and he concluded with his evidence that there

23   was no payments missing in 2010 as I said.

24         I also just recently just submitted a brief

25   and I was showing all my payments breaking down the

1   payments, backing down the money in which it clearly

2   shows on both of the briefs, mine and Judge Lawson's,

3   that I included $19,009 into my regular house note which

4   paid the 2010 taxes.

5              Now, just to let the Court know, I was only

6   late with the 2010 taxes when Bank of America's employee

7   called me up and told me that they paid the taxes for me

8   and I needed to pay them back.  I agreed with them and

9   said, okay, I will put the extra money in there.

10             So my very first payment that I gave Bank of

11  America was a thousand dollars in December, December

12  31st, 2015, for a thousand dollars along with my regular

13  house note, which was a separate payment.

14             They never counted the money.  It went to

15  something in -- I don't know what they call it, but it

16  went to something else and they never counted it.

17             Then throughout 2011, every month when I

18  gave them a check, just looking at the checks you see my

19  house note is a fixed note at $2,198.47.  Every month

20  basically in 2011 you see checks for 3,000 something

21  dollars; 3,000, 6,000.  I was paying the 2010 taxes.

22             Now, once I paid the 2010 taxes, I was done,

23  and then all of a sudden the 2011 taxes came in.  So

24  just at that time Bank of America very quickly paid it

25  again.  And I called and talked to Michael and said why

1   are you paying this again?  He said, don't worry about

2   it, Mr. Scott, we do this sometimes.  He said, just go

3   ahead and finish paying like we agreed and it will be

4   fine.  So then I just kept paying.  You will see that I

5   just kept paying.

6            And then once I paid up the 2011 taxes, it

7   came almost time for 2012.  And I said, I see what they

8   are doing, they want to try to keep this escrow account

9   that they told me would just be temporary until I paid

10  my taxes off.  I said, I'm going to beat them to the

11  punch.

12           So in February of 2012, I gave them a check

13  for $8,000; $2,198 was my regular house note and the

14  other 6,000 was for the 2012 taxes totalled.

15           With that, the next two months I said I'm

16  fine, I can go back to my regular house note.

17           I went back to my regular house note, sent

18  the next two notes in and then they started sending me

19  back my checks saying they didn't want it.

20           Next thing I know, Bank of America

21  foreclosed on me saying I missed six mortgage payments.

22           But while we were in the case and I

23  basically proved that no six mortgage payments were

24  missing, Bank of America then came back and said that I

25  did not pay any more taxes for 2010, '11 and '12.

1            Again unfortunately, even though I did prove
2     it and have it, my case was dismissed with that.  But I
3     still fought it all the way to try to show that I had
4     everything.  But again, unfortunately, my case was
5     dismissed.
6            Now, with this, if you look at it, Your
7     Honor --
8            THE COURT:  Now, what happened to your
9     house?
10           MR. SCOTT:  I'm still living in my house,
11    Your Honor.
12           THE COURT:  Was it foreclosed?
13           MR. SCOTT:  No, because what the last case
14    when Bank of America told me I had to give them
15    $20,104.29, they said that brought my foreclosure
16    current and the case was closed.  But what they did not
17    count was the 19,000 that I included in all of my
18    mortgage payments throughout 2011.  They never counted
19    that money.
20           THE COURT:  Now, do you still have a
21    mortgage with them?
22           MR. SCOTT:  Yes, I do.  My mortgage should
23    be finished paid up now in 2019.  I have two years left
24    to pay off my mortgage because I did go to a 15-year
25    mortgage.

```
 1                    THE COURT:  And it is with Bank of America?

 2                    MR. SCOTT:  Yes, it was with Bank of America

 3            So Bank of America started the foreclose and

 4     then they said I did not pay my takes, and that's what

 5     started everything with Bank of America.

 6            Now, with Trott, Trott wrote a lot about the

 7     last case, but then again, Bank of America was never

 8     called in this case.  Bank of America never cited

 9     anything in this case.  So Trott Law is only going by

10     what was in the purser system only.  Even with them

11     talking now about the payments, nothing was verified.

12     Because Bank of America was supposed to send me back a

13     notice, as Trott Law even indicated, indicating what

14     payments I did pay them, what payments they are saying

15     were missing.

16            I never received anything from anyone

17     because no one was called and I never received anything.

18            Also, Your Honor, again like I told you, I

19     sent letters to the attorneys telling them to call

20     Trott.  I asked Trott to call them.

21            Trott Law advised me that they had no

22     responsibility and they would not be able to contact a

23     third party because that would be also a violation of

24     the FDCPA Act and they wouldn't do it.

25            I asked the attorneys from the two law firms
```

1    to do it, they wouldn't do it.

2              But while in discovery, once the court

3    ordered Trott to turn over that referral, Trott turned

4    over the referral and then Trott added more to it

5    besides just the referral.  And Trott then list the fact

6    that they were actually talking to the two law firms all

7    the time.  About my case.

8              So not only were they also violating the

9    FDCPA Act with that to a third party but they were also

10   maintaining this communication and while all along no

11   one would tell me anything and wouldn't tell me

12   anything.

13             Trott also, Ma'am, once they turned over all

14   of that, gave up two different names from Bank of

15   America that said that they were the ones basically I

16   guess started the foreclosure against me.

17             Now Your Honor, if you look at Bank of

18   America says I owe $179,000 and so much money.  Again,

19   my house note is only $2,198.47.  If you take that away,

20   that would mean it goes back to 2010 saying that I

21   haven't given them a payment since 2010 if you add all

22   that money up.  And that is just absolutely incorrect.

23             Plus, Bank of America told the District

24   Court and the Sixth Circuit Court of Appeals that they

25   counted all my money and for them to say that that was

1   the reason why my case was dismissed because had Bank of

2   America went back to the Court and said he owes

3   $179,000, my case would have went to trial for the very

4   first time.

5              So why did Ms. Vitas who told me that she

6   was general counsel for Bank of America come tell me now

7   that she had nothing to do with it and then turn around

8   and Trott Law says, yes, we have been talking to her.

9              So it is almost like, Your Honor, who are we

10  to believe?  Did Trott Law actually talk to the two law

11  firms or are those two law firms telling fibs?

12             Right at this point we don't know because we

13  just found out, I just found out at the very last minute

14  who these two people from Bank of America was.  And now,

15  the actual conversation basically what happened with

16  Trott Law and the people.

17             In my opinion, Your Honor, I'm asking the

18  Court to not grant their motion because nothing has been

19  verified like you asked them to.  They're only going by

20  what they went into the purser and looked up and Trott

21  Law is a debt collector.  Because, you are a law firm,

22  too, but every letter that they sent me said we are a

23  debt collector collecting a debt.  So you had to follow

24  the rules and regulations of a debt collector and Bank

25  of America cannot hold your hand to do that.  You had

1   certain things they had to do and they failed to do

2   that.

3                 And with that, Your Honor, me, my wife and

4   family were harmed.  I was forced into filing Chapter 13

5   to stop them because I had no choice.

6                 If I had waited on the last day to come

7   before this Court, anything could have happened.  You

8   could have had a case going, anything could have

9   happened.  And the following day on November 8th, my

10  house would have been sold.

11                So I could not take that chance.  I filed

12  that Chapter 13 to stop them because I knew it would

13  stop them at that point because they refused to call

14  them, they refused to do anything.

15                And I have been damaged now for the next 10

16  years of our lives.  Severely damaged.

17                As far as payments, again, ever since the

18  magistrate ordered me to pay them $2,888.98 in that last

19  court case, I paid it.  I told the magistrate at that

20  point that once I paid that 19,000 and then they forced

21  me to give them another 20,000, I told him I was broke.

22  It is on the records.  I told the magistrate, sir, I

23  have no more money except for $150.00 for me and my

24  family at that point once I gave them the other $20,000.

25  I was completely broke.

1          And I said it would take me some time to try

2     to get myself back together again.  And so it took me

3     three months to get myself back in some type of working

4     area to try to have anything.  But everything associated

5     with my family skyrocketed even to this day.

6     Everything.  Skyrocketed.

7          This has been very hard on me and my family.

8     I have provided Bank of America all my checks.

9          And another quick point, Your Honor, when I

10    sent my letter to Madden, Hauser, when I sent them my

11    letter and I asked them, I said, please provide me every

12    check that I gave you.  They sent back all the copies of

13    my checks but they added on.  Instead of just sending me

14    the copies of the checks, they went in and said these

15    first 10 payments we gave right back to you.  The second

16    19 payments, we gave to the bank and the bank told us to

17    give it back to you.

18         But in reality, Your Honor, they violated

19    the court order from the magistrate from the first court

20    hearing we had.

21         I was ordered to give my payments to the

22    lawyers and the lawyers were ordered to give my payments

23    to their clients.

24         Well, they never did it, and they gave the

25    checks right back to me.  And then Bank of America

1    turned around and started a foreclosure on me.

2              So their attorneys, violating the court

3    order, held my checks, some for over a year, and then

4    they started writing false briefs that was in the

5    district court and said I didn't pay the clients

6    anything.  No money whatsoever.  And the court relied on

7    what they said.

8              There was one part that the magistrate said

9    he relied heavily basically on what Bank of America said

10   and not what I was saying to him.

11             So I have the lawyers themselves holding my

12   checks.

13             Now, the next 19 checks, as he said, I truly

14   don't know if Bank of America, if they ever gave those

15   checks to Bank of America, I truly don't know.  But I do

16   know that their letter actually proved that they

17   violated the court order and never gave the court my

18   checks which then started this second foreclosure by

19   Bank of America saying we never received $179,000 from

20   you.

21             And I have never missed a payment.  They

22   sent back all my checks.

23             Now, as my bank told me, Your Honor, and I

24   think almost all banks have this, any check that is

25   given out, if you don't cash it within a certain amount

1    of time, the check is voided.

2              Well, my bank says six months the check is

3    voided and they would have to be rewritten.

4              Well, Bank of America not only held checks

5    for six months, but they held checks for over a year.

6    And then they went to go try to cash the checks.

7              Now, Chase Bank made a mistake and they told

8    me they made a mistake and cashed them some of them

9    because I had all my money in the account to cover the

10   checks that were valid at that time.  And with them

11   holding checks, and I think it amounted to almost 20

12   checks that they tried to turn in at one time.  And

13   these are all the checks they said they ever received

14   from me and they turned them in.

15             Your Honor, in my briefs I have cited cases

16   in my brief.  I know Mr. Welke said I haven't, but I

17   have.  In my brief, I have cited cases.  I have cited

18   the rules, and again, Your Honor, I'm just saying that

19   the motion should be denied because there are no missing

20   payments.

21             Bank of America never verified anything.

22   After you ordered them to go verify, it was never

23   verified.

24             Again, all these payments that he is

25   speaking with is just what he received or got out of the

1   purser system by himself.  So there has never been

2   really a complainant to finish doing what the FDCPA Act

3   says that they have to do.

4          The other five counts, if you look at

5   everything they did right here, the other five counts

6   are absolutely valid.

7          The fraud, it was plain fraud what they did.

8   They have added -- at first they were going to receive,

9   Trott Law was going to receive $200.00 extra because

10  that was over what was on the referral.  They can't

11  exceed what's on the referral.  That is not up to Trott.

12  Trott is just a debt collector.  They must collect the

13  debt what Bank of America tells them and Bank of America

14  said $179,000.  Trott added 200 something dollars onto

15  it.

16         Then once Trott listed my house in the

17  paper, they added another 500 which took it up to about

18  700 something dollars.  That has nothing to do with

19  fees.  It has nothing to do with any of that.  They

20  could only collect what Bank of America tells them that

21  was owed and they failed to do that.  They added on

22  money and that was fraud what they did and they got

23  caught with it.  They were caught.

24         Because it's just the proof is right in

25  their writings that they gave and the items that I have

1   turned in which shows how and why they did that.

2            At this time, Your Honor, I will just stop

3   at this time.

4            THE COURT:  Okay.  Now, Mr. Scott, you know

5   that insofar as these 19 payments and the 10 payments,

6   those are all part of your prior case.  I'm not going to

7   relitigate that, okay.  That is not before me.

8            MR. SCOTT:  Yes, Ma'am.

9            THE COURT:  To the extent that any of that

10  relates to whether or not there is any violation of the

11  Fair Debt Collections Act and whether or not there is

12  fraud in your other claims, I will consider it, but I

13  won't be relitigating what another judge of the court

14  already litigated because that has already been

15  litigated in another court; is that right?

16           MR. SCOTT:  Yes, Your Honor.

17           THE COURT:  And they didn't determine

18  whether or not you had to make any more payments on this

19  mortgage to Bank of America, right?

20           MR. SCOTT:  Say that one more time.

21           THE COURT:  At the end of that case was it

22  determined whether or not you had any amount due and

23  owing to Bank of America?

24           MR. SCOTT:  No, Your Honor, they said I was

25  paid up and that case was closed.

1              THE COURT:  No, I mean do you have any

2    outstanding mortgage payments that you owed after that?

3              MR. SCOTT:  No, Ma'am.  I gave them a check

4    every single month.

5              THE COURT:  The mortgage was paid off?

6              MR. SCOTT:  No, monthly payments.  I kept

7    giving them their monthly payments.

8              THE COURT:  Let me rephrase my question.

9              At the end of the case, did you still owe

10   any monthly payments to Bank of America?

11             MR. SCOTT:  Yes.

12             THE COURT:  And it was resolved how much

13   that was, right?

14             MR. SCOTT:  No.

15             THE COURT:  Well, then, why are you making

16   the payments if you don't know how much is owed?

17             MR. SCOTT:  Oh, my monthly payment is fixed.

18             THE COURT:  Oh, no, what is your overall

19   payment that is due and owing?

20             MR. SCOTT:  It's about $60,000.

21             THE COURT:  And was that resolved in that

22   prior case?

23             MR. SCOTT:  No.

24             THE COURT:  Well then how did you get to

25   that amount?

1          MR. SCOTT:  I pulled up --  because I have a

2  fixed payment and fixed interest rate, I pulled up

3  amortization chart and I put in my interest rate which

4  is fixed and put in my payment and it can show you my

5  15-year history where it can go to any month, any date

6  and you will see what I owe left and what I paid.  It's

7  a fixed rate.

8          THE COURT:  So you know how much is finally

9  due and owing, right?

10          MR. SCOTT:  Yes.

11          THE COURT:  And so whatever amount you owe,

12  you know that amount now?

13          MR. SCOTT:  Yes.

14          THE COURT:  And so you don't have any

15  further dispute with Bank of America; is that right?

16          MR. SCOTT:  Well, I do --

17          THE COURT:  Unresolved by that case.

18          MR. SCOTT:  Of that case, no.  That is of

19  this case that is my dispute because they tried to come

20  right back and say that I owed 179,000 again.

21          THE COURT:  But this case is not against

22  Bank of America, you know that, right?

23          MR. SCOTT:  That's correct.  Because at

24  first Trott Law said that they -- well, they said they

25  didn't even have a complainant and then once they came

1   up and said that they did have a complainant, but again,

2   Bank of America never verified anything with Trott Law

3   yet.  Nothing has been submitted.  By Trott.  Bank of

4   America was never called.  We truly at this point don't

5   know.

6               THE COURT:  Don't know what?

7               MR. SCOTT:  If Bank of America because Bank

8   of America did not verify the payments as Mr. Welke has

9   indicated that they have because nothing has been turned

10  in.

11              THE COURT:  So now what don't you know?

12              MR. SCOTT:  I don't know truly how much I

13  owe with Bank of America.

14              THE COURT:  You just told me you owe 60,000

15  some dollars.

16              MR. SCOTT:  With the amortization, yes, and

17  with me paying all my payments, yes, I do know that.

18  But with Trott Law arguing about payments, they don't

19  know because Bank of America never verified any payments

20  with them.

21              THE COURT:  So now tell me this, other than

22  the advertisements in the paper, it is my understanding

23  these advertisements you claim are an effort to collect

24  the debt; is that right?

25              MR. SCOTT:  That's correct.

1          THE COURT:  And what else do you claim is an

2    effort to collect the debt?

3          MR. SCOTT:  When they listed my house four

4    times in the paper after I sent them my certified letter

5    telling them I disputed it.  The FDCPA Act says they

6    must cease any type of collection efforts.

7          THE COURT:  I understand that.  Are you

8    claiming anything else that was an effort to collect the

9    debt?

10         MR. SCOTT:  Just when we were last standing

11   in front of you, Your Honor, when I was asking for the

12   injunction where Trott Law basically was wanting to deny

13   my injunction so that they could sell the house or they

14   wanted the money.  So it was still going up at that

15   point.  They never stopped trying to collect the money

16   because they were going to sell my house if I did not

17   file that Chapter 13.

18         THE COURT:  All right.  Thank you.

19         MR. WELKE:  Brief reply?

20         THE COURT:  You may.  And start with

21   attempting to sell his house at foreclosure after this.

22         MR. WELKE:  I'm sorry, please say that

23   again.

24         THE COURT:  Mr. Scott's claim is that -- and

25   I understand your argument relative to the

1    advertisements already placed.  I want you to speak to

2    any action you took to continue to foreclose against his

3    house by selling it on November 8th.

4              MR. WELKE:  Any action that Trott took to

5    foreclose the house, the first thing we did was receive

6    the referral.  The second thing we did was draft the

7    fair debt letter based on the referral and updates from

8    whatever the client indicated.  The referral did list

9    the per diem.

10             After the fair debt letter was drafted

11   September 20th, on I believe it was October 5th, we

12   ordered -- arranged for a sheriff's sale and a

13   publication and a posting.  The sheriff sale arrangement

14   was what a basically the sheriff department gets a sale

15   date, the publication was to send the publication to the

16   newspaper to publish it and the posting was done by the

17   newspaper.  They hired someone to post the property with

18   the publication.

19             That was done -- that was ordered on October

20   5th.  The first publication I believe was October 7th.

21   We received the dispute letter on October 11th.

22             The next thing that happened in this case

23   was that we received the complaint, we filed a complaint

24   and a request for TRO and we appeared in court.  We

25   forwarded the -- I should say on October 11th when we

1    received the dispute letter, we forwarded that to the

2    client.

3              After that, we did nothing.  Trott did

4    nothing.  Initiated no new collection activity with

5    regard to this particular foreclosure.

6              Does that answer your question?

7              THE COURT:  Did you still have a sheriff's

8    sale set for November 8th?

9              MR. WELKE:  The sheriff's sale never took

10   place --

11             THE COURT:  That wasn't my question though.

12   Did you still have one set for November 8th?

13             MR. WELKE:  Did we still have one set for

14   November 8th?  I do believe that it was set for November

15   8th but it never took place.

16             THE COURT:  Did you ever cancel it?

17             MR. WELKE:  Actually, yes, we did cancel it,

18   but the bankruptcy also cancelled it.

19             We didn't know about the bankruptcy until

20   after I think it was the hearing date in this Court.

21             THE COURT:  Okay.  Anything else you want to

22   add?

23             MR. WELKE:  Yes.  When he claims that the

24   debt collector must verify the debt and that's his basis

25   for our fair debt violation, that is not what 1692(g)

1   states.  What 1692 states is that until the debt

2   collector obtains verification, the distinction is that

3   the debt collector does not verify the debt, only the

4   lender can verify the debt.  There is no way -- we do

5   not have the records, we must depend on the lender to

6   verify the debt.  And that is why I indicated in the TRO

7   response that we were waiting for the lender to verify

8   the debt.

9           The fact that Trott never verified it, Trott

10  couldn't verify it.  1692(g) states that the collector

11  obtains the verification and mails it to the consumer.

12          With regard to the 2012 case that Mr. Scott

13  refers to, that case is, the case number is listed in

14  the pleadings here by Mr. Scott and myself I believe and

15  the basic complaint there was a payment history, and I

16  think Mr. Scott accurately stated that Bank of America

17  claimed that he was six payments behind.  Mr. Scott

18  filed a complaint and that complaint was dismissed and

19  shortly thereafter Mr. Scott paid $20,000 to reinstate

20  the loan which I think he indicated just a few minutes

21  ago.  And basically his case was dismissed.  He lost the

22  case and he had to pay the $20,000 reinstatement to

23  reinstate the mortgage to avoid the foreclosure.

24          He thinks he won that case, he didn't.  He

25  lost that case.

1          With regard to the attorneys, the Madden,

2     Hauser and Brian Cave violating a court order, my

3     understanding in the 2012 case was that Judge Lawson did

4     say that Bank of America is represented by counsel and

5     Mr. Scott should not be talking to them, so Mr. Scott

6     should send his payments to the attorneys who at the

7     time were Madden, Hauser and Brian Cave.

8          The dismissal negated that order.  That

9     order was not in effect or that order ceased to be valid

10    after the dismissal.

11         There's nothing in that order that stated or

12    required Mr. Scott to continue making his payments to

13    the attorneys Madden, Hauser or Brian Cave.  He

14    continued to do that for now it appears like well over

15    three years.

16         He never missed a payment, he claims.  The

17    payments he's made were checks that were written and

18    given to the attorneys that were either returned to him

19    by the attorneys or returned to him by Bank of America.

20         He claims that his balance is 60,000 and he

21    arrived at that based on an amortization schedule.  And

22    it is true that you can use an amortization schedule to

23    figure out your balance, but that assumes that you've

24    made the payments.

25         Discovery in our subpoena, our first

1    subpoena, indicates we sent a subpoena to JP Morgan

2    Chase, which is Mr. Scott's bank, who he issues his

3    checks from, and they indicate that -- and that is part

4    of our pleadings in other motions -- they indicate that

5    there has not been a check negotiated to the Bank of

6    America for the last at least 15 months.

7           When I said that he hadn't cited any cases

8    and Mr. Scott said he did cite cases, what I really

9    meant was, and I think I stated it but maybe it wasn't

10   heard correctly, but he did not cite cases that I cited

11   for the proposition that collection activities, the

12   posting and the publication that occurred after the

13   dispute letter and were done by third parties were not

14   debt collection activities that would attribute

15   liability to the collector.  That is what I meant by

16   that and that's what I hope came across.

17          His basic claim is that Trott did not

18   validate, and that goes back to 1692.  The collector

19   must obtain the verification.

20          Trott does not -- Trott is not the one that

21   validates the debt.

22          THE COURT:  I heard that.  You've already

23   argued that, you don't have to keep arguing that.

24          MR. WELKE:  You got that, all right.

25          THE COURT:  Thank you.

1          MR. WELKE:  And what I think he means when

2   he says that there is no complainant in this case, I

3   think he means that Bank of America did not hire Trott

4   as the attorney to do the foreclosure.  I think that's

5   what he means.  I could stand to be corrected.  He could

6   also mean what I meant to say was that Bank of America

7   was not in this case and this case from probably about

8   75 percent of what Mr. Scott just ran through, ran by

9   this Court that this Court can see or should be able to

10  see and determine that this is really a payment dispute

11  between Mr. Scott and his lender.

12          THE COURT:  No, this case is not a payment

13  dispute case, this case is a complaint by Mr. Scott

14  against Trott Law.  It isn't against Bank of America.

15          MR. WELKE:  I understand, but his dispute is

16  really against the lender and it is in the form of a

17  payment dispute.

18          THE COURT:  Anything else you want to add?

19          MR. WELKE:  No, thank you very much.

20          THE COURT:  I've heard your arguments and I

21  was going to rule today but I think I want to add a few

22  things into my ruling, and at that time I will rule on

23  the other documents as well.

24          MR. WELKE:  Very well.

25          THE COURT:  Thank you very much for your

```
1   arguments.

2                    (Proceedings concluded at 4:37 p.m.)

3              *  *  *  *  *  *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T I O N

I, CHERYL E. DANIEL, Official Federal Court Reporter, after being first duly sworn, say that I stenographically reported the foregoing proceedings held on the day, date, time and place indicated.  That I caused those stenotype notes to be translated through Computer Assisted Transcription and that these pages constitute a true, full and complete transcription of those stenotype notes to the best of my knowledge and belief.

I further certify that I am not of counsel nor have any interest in the foregoing proceedings.


CHERYL E. DANIEL,

FEDERAL OFFICIAL COURT REPORTER


DATED:  March1, 2018

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25